**SOUTHEAST NURSING HOME, INC., a corporation, Plaintiff,**

v.

**The ST. PAUL FIRE AND MARINE INSURANCE COMPANY, Defendant.**

Civ. A. No. 79–AR–0808–S.

United States District Court,
N.D. Alabama, S.D.

Dec. 29, 1982.

James E. Clark, London, Yancey, Clark & Allen, Birmingham, Ala., for plaintiff.

William C. Wood, Jr., Robert D. Norman, Norman, Fitzpatrick & Wood, Birmingham, Ala., for defendant.

### MEMORANDUM OPINION

ACKER, District Judge.

On December 20, 1979, Hon. Frank H. McFadden of this Court granted the motion of defendant, The St. Paul Fire and Marine Insurance Company (St. Paul), to dismiss that portion of the complaint of Southeast Nursing Home, Inc. (Southeast) which attempted to claim a breach of the insurance agreement. Judge McFadden held that Southeast's failure to follow through with the binding arbitration provision in the agreement precluded, as premature, any claim under the insurance agreement itself. Southeast also moved to disqualify the arbitrator who had been selected by St. Paul. On August 6, 1980, Judge McFadden overruled Southeast's motion to have St. Paul's arbitrator disqualified, finding no provision in the policy which required that an arbitrator selected either by the insured, or by the insurer, be "disinterested". Then Southeast sought leave to amend its complaint, *inter alia,* to reassert its claim for breach of the policy. On June 25, 1981, Judge McFadden overruled Southeast's said motion "with respect to the claim for breach of the insur-

ance policy". The case has now been reassigned to the undersigned, and Southeast has renewed its motion for leave to amend its complaint and has requested reconsideration of its claimed right to assert a claim for breach of the policy under the particular circumstances in this case. In the alternative, Southeast requests the Court to certify the "arbitration" question to the Supreme Court of Alabama or to enter an order which would permit an interlocutory appeal of the question by Southeast to the Eleventh Circuit.

The Court is willing to take a careful re-look at the issue, not only considering the previous rulings by Judge McFadden, but the new briefs and oral arguments by both parties.

### MUST SOUTHEAST PROCEED WITH ARBITRATION?

Southeast purchased from St. Paul an insurance policy, which, among other things, expressly protected Southeast from fire damage to its nursing home. The nursing home was seriously damaged by fire. Southeast made claim on the policy. This occasioned a controversy between the parties over the extent or amount of the damage. Several repair estimates were made. St. Paul first obtained a bid from Shaddix Building Supply Co. for $67,639.75. Southeast then secured an estimate from E.L. Robbins Co. in the amount of $209,656.00. St. Paul, considering the disparity between these two figures, requested another estimate, and Daniel Construction Company provided an estimate of $71,077.67.

Southeast thereupon invoked the arbitration clause of the policy, which reads:

*Arbitration of property disputes*

If agreement can't be reached on the amount of your loss, the following procedure will be used:

1. One of us will make a written demand for arbitration.

2. Each will select an appraiser and decide on a reasonable time and place for an appraisal of the loss and damage.

3. The appraisers will agree on a competent and impartial umpire. If they can't agree on an umpire within 15 days, a judge in the state where the appraisal is to be held will be asked to pick one.

4. The appraisers will each compute the loss and state the actual cash value of the property at the time of loss and the amount of the loss. If they don't agree, they'll submit their appraisals to the umpire. Agreement of two out of three will decide the amount of the loss.

You'll pay your appraiser and we'll pay ours. And other costs of the appraisal and the umpire will be equally divided between us.

We won't be held to have waived any of our rights under this policy because of the appraisal.

Suits against us

You agree not to sue us to recover under this policy unless you've lived up to all its terms.

■ Upon receiving Southeast's demand for arbitration, St. Paul picked John Vinsant as its "appraiser". Next, after obtaining counsel, Southeast obtained an estimate from John O. Freeman of between $192,-720.00 and $225,000.00. There is some question as to the timing of Vinsant's appointment by St. Paul. Southeast asserts that Vinsant's appointment took place only after he had done an estimate for St. Paul. St. Paul denies this. However, for the purposes of summary judgment consideration, this factual conflict is not material, or determinative. For what it is worth Vinsant's estimate of $72,669.02, was of the building only. Vinsant did not evaluate the contents. This means that his alleged "prejudgment" of the damages was only partial. Neither is this fact, although undisputed, an operative fact.

Southeast then purported to revoke its arbitration demand. Since that moment it has steadfastly refused to appoint an "appraiser" or to proceed with arbitration, claiming that St. Paul has materially breached the agreement by attempting to appoint an "appraiser" who is not "disinterested" in that he has prejudged the issue to be arbitrated, namely, the amount of the damage, and that under this circumstance, St. Paul cannot insist on arbitration as a pre-condition to Southeast's suit for breach. In short, Southeast asserts that Vinsant is biased and therefore disqualified. Southeast extends its attack by claiming that St. Paul is acting in "bad faith" in its choice of arbitrator. This contention is, in this Court's opinion, a redundancy. For the sake of this decision, the Court will assume that Vinsant is biased in the sense that he conducted his own investigation of the damage before any arbitration hearing was scheduled, and arrived at his own conclusion on a material issue without reference to evidence which might have been presented at an arbitration hearing.

The Court has not relied entirely upon the various authorities submitted by the parties. This is not because of any lack of diligence by counsel for the parties, or lack of ability, but because the cases cited fail, in the Court's opinion, to tell the whole story.

The first case discussed by both parties is *Simonetti v. Niagara Fire Insurance Co.*, 74 F.Supp. 726, 729 (N.D.Ala.1947) aff'd, 164 F.2d 878 (5th Cir.1947), in which this Court, speaking through Hon. Seybourn Lynne, held:

... the mere nomination by the insurer of a disqualified appraiser, who was never accepted by the insured because of his known disqualification and who never entered upon the process of arbitration, did not constitute a breach of the insurance contract.

\* \* \* \* \* \*

If it should be conceded that defendants had breached their contracts in this regard, it is my opinion that such breach would fall short of repudiation of the contracts by defendant or of an intentional abandonment equivalent thereto. Nor are these such cases as that justice would require that irrespective of repudiation or abandonment the plaintiffs, who claim to have been aggrieved by defendants' wrongful and oppressive use of the arbi-

tration provisions in an effort to obtain an unfair measurement of the amount of the loss, should be relieved of a duty to treat the contracts as subsisting in so far as the ultimate issue of liability for such loss is concerned.

While Southeast quarrels with Judge Lynne's conclusion, it also urges that *Simonetti* is distinguishable and can be interpreted, if not to put St. Paul in breach of its agreement with Southeast, to recognize that an insurer cannot be allowed to appoint a "disqualified appraiser". Although the report of the three consolidated *Simonetti* cases does not reflect it, an examination of the original insurance policies attached to the complaints in those cases (Civil Action Nos. 5254, 5255, 5256) shows that the policies *expressly required that the appraisers be both competent and disinterested.* There is, therefore, a very material distinction between the policies in *Simonetti* and the policy which here covered Southeast, because the instant policy contains *no such requirement.* This distinction makes *Simonetti* more persuasive for St. Paul than any interpretation Southeast can place on it.

Southeast further cites a series of Alabama decisions, including *Hall & Brother v. Western Assurance Co.,* 133 Ala. 637, 32 So. 257 (1901), (*Western Assurance I*) where the Supreme Court of Alabama held that the question of the "disinterestedness" of an arbitrator is a matter for jury determination. In *Western Assurance I,* however, it was the insurance policy itself, and not Alabama law, which required that the arbitrator be disinterested. Here, again, Southeast's policy contains no requirement, express or implied, that the arbitrator be "disinterested" or "competent", and this Court is unwilling to create such a requirement. Furthermore, any indication in *Western Assurance I* that selection of an arbitrator is not effective until accepted by the other party, is placed in serious doubt by modern arbitration law and practice. It makes little sense for a contracting party to invoke arbitration and then to be allowed to withdraw such invocation by the expedient of refusing to accept the arbitrator appointed by the other party.

Southeast next relies on *Western Assurance Co. v. Hall Bros.,* 143 Ala. 168, 38 So. 853 (1904), (*Western Assurance II*) for the proposition that if it should now select an arbitrator it would be waiving its claim of impartiality by Vinsant. Because the Court does not believe impartiality is required under the terms of this particular policy, this issue addressed in *Western Assurance II* becomes moot.

Southeast also cites *Bole v. Nationwide Insurance Co.,* 238 Pa.Super. 138, 352 A.2d 472 (Pa.Superior 1975), for the proposition that arbitrators must, in all instances, be impartial. This decision was appealed to the Supreme Court of Pennsylvania where it is reported at 379 A.2d 1346 (Pa.1977). It was the Supreme Court of Pennsylvania itself, not cited by Southeast, which makes it apparent that the courts were there dealing with a situation involving a *contractual requirement* that the arbitrator be disinterested. The Supreme Court of Pennsylvania, in affirming the Superior Court, made the following pointed remarks in footnote 2:

As Judge Van der Voort stated in his opinion:

Because they are the final decisionmakers on the law and facts of the case, whose decision is final absent fraud or misconduct, arbitrators under common law stand as judges. Their function is judicial, and their conduct must be robed in judicial impartiality...

\* \* \* \* \* \*

*In light of the contract provision calling for disinterested arbitrators,* we agree with Judge Van der Voort's statement. If a contract calling for common law arbitration allowed the selection of partisan arbitrators, the above-quoted statement [*relied on by Southeast*] would not then be applicable. (emphasis supplied).

Southeast next argues that § 6–6–6, Code of Alabama (1975), requires in all instances that an "arbitrator" be impartial. Southeast's reliance on this statutory provision is misplaced. First, the instant insur-

ance policy refers to those persons chosen by the parties as "appraisers" and not as "arbitrators". The contracting parties therefore recognized some distinction between an "appraiser", which probably contemplates partiality, and an "arbitrator", which may or may not contemplate impartiality. The Alabama arbitration statutes are in derogation of the common law, which distrusted arbitration. This distrust was deeper where the arbitrators were contractually authorized to determine the question of basic or underlying liability and were not limited to a determination of the amount of a particular loss. In this case, of course, the parties do not purport to take from the courts the general question of St. Paul's liability, even though no such liability question here exists, and thus the proposed arbitration is of the most limited type. Secondly, § 6–6–6 requires only that before making an award "the arbitrators *must be sworn impartially* to determine the matter submitted to them ...". (emphasis supplied). This language does not mandate that an arbitrator, at the time of his appointment, *in fact be* totally impartial in the sense that he has never had any contact or connection whatsoever with the party who chooses him. It only mandates that in order to qualify as an arbitrator he *swear that he will be impartial* in his consideration of the evidence. Vinsant may or may not be willing to take such an oath. Unless and until Southeast proceeds with arbitration, Southeast will never have an answer to this question. In this Court's view, § 6–6–6, as a part of Alabama's arbitration scheme (contained in §§ 6–6–1, *et seq.*), may or may not be a prerequisite to judicial enforcement of an arbitration award in Alabama. It is certainly not a limitation on the parties' right to bargain for something different. Southeast did not expressly invoke §§ 6–6–1, *et seq.*, when it invoked arbitration, as was done in *Tennessee Coal, Iron & R. Co. v. Roussell,* 155 Ala. 435, 46 So. 866 (1918), where a written agreement called for arbitration "in accordance with the statutes of Alabama." 46 So. 869. And even in that case the Supreme Court of Alabama held that the oath could be waived, thus indicating freedom of contract by the arbitrating parties. Here, Southeast only invoked the arbitration provision of the contract which provided the method of arbitration.

Because the insurance contract itself looms large, a close look must be taken at the *actual words* of the contract. Do the words indicate whether or not the parties intended their respective appointed "appraisers" to be absolutely impartial? The pertinent provision of the policy provides that "the *appraisers* will agree on a competent and *impartial umpire*". (emphasis supplied). The fact that the "umpire", or arbitrator chosen by the "appraisers" in the event they cannot agree, must be impartial, necessarily implies that the "appraisers" themselves need not likewise be impartial. It is within the personal knowledge of the writer of this opinion, who has in the past served as an arbitrator under the rules of the American Arbitration Association, that the usual and customary practice in Alabama is for the opposing parties to pick partisan "arbitrators" whose only real function and purpose is then to pick a third, non-partisan person, who then becomes the only *true* arbitrator, or the umpire. The language of this insurance policy recognizes and adopts this customary practice.

A leading Alabama case is *Headley v. Aetna Ins. Co.,* 202 Ala. 384, 80 So. 466 (1918). There the Supreme Court of Alabama concerned itself with an arbitration clause similar to the St. Paul policy here, *except* that it called for "disinterested parties as appraisers" 80 So. 468. It also called for the ascertainment of the loss by these "disinterested appraisers" appointed respectively by the insurer and the insured, with the "appraisers" in turn, to appoint a third-party umpire. The Alabama court held:

> If parties to contracts of insurance covenant that in case of disagreement as to the amount of the loss or damages, or the value of the property destroyed or damaged, they will submit such difference to disinterested parties as appraisers, arbitrators, or umpires, and provide a mode for selecting such parties, and make an

award of such parties a prerequisite to the bringing of a suit on such insurance policy, such covenant or agreement is valid, and will be enforced by the courts, in the absence of surprise, mistake, fraud, etc.

\* \* \* \* \* \*

The award is not under all circumstances a prerequisite to the bringing of an action. If the award is provided for, as in the contract under consideration, then the assured must show that it has been made, as provided, or show a valid excuse for its not being made—that it is impossible for him to have it performed, that the failure was unavoidable so far as he is concerned, is a valid excuse, just as the fact that the failure was induced by the fault of the insurance company.

The correct rule, as we hold, is well stated by the Supreme Court of the United States:

"Where the parties, in their contract, fix on a certain mode by which the amount to be paid shall be ascertained, as in the present case, the party that seeks an enforcement of the agreement must show that he has done everything on his part which could be done to carry it into effect. He cannot compel the payment of the amount claimed, unless he shall procure the kind of evidence required by the contract, or show that by time or accident he is unable to do so." *United States v. Robeson,* 9 Pet. 319, 327, 9 L.Ed. 142.

■ Based on the foregoing, St. Paul's objections to the allowance of Count Z are well taken. Southeast's request for leave to reassert a claim on the insurance policy is due to be denied, and Judge McFadden's ruling on this issue will not be disturbed.

Because the law applicable to the undisputed facts leads to the conclusion that Southeast must continue the course of arbitration which it chose before it comes to this court, there is no reason to decide whether or not Vinsant, is in fact, disinterested. The issues collateral to this central issue are mooted by the decision on the central issue.

## THE CLAIM OF "BAD FAITH"

While the court is taking a backward look at the previous orders entered by Judge McFadden, the Court, on its own motion, has re-examined Southeast's attempt to state a claim of "bad faith" refusal to pay the fire damage claim.

On June 25, 1981, when Judge McFadden allowed Southeast to assert a claim of bad faith refusal to pay, he relied only upon the then new doctrine announced in *Chavers v. National Security Fire Ins. Co.,* 405 So.2d 1 (Ala.1981). Since Judge McFadden's opinion of June 25, 1981, there have been two cases decided by the Supreme Court of Alabama which severely circumscribe and limit *Chavers* and which close the door on Southeast's claim of bad faith. The first of these cases is *National Security Fire & Casualty Co. v. Bowen,* 417 So.2d 179, 183 (Ala.1982), which says:

An insurer is liable for its refusal to pay a direct claim when there is no lawful basis for the refusal coupled with actual knowledge of that fact. *Chavers v. National Security Fire Ins. Co.,* Ala., 405 So.2d 1 (1981). No lawful basis "means that the insurer lacks a legitimate or arguable reason for failing to pay the claim." *Gulf Atlantic Life Ins. Co. v. Barnes,* Ala., 405 So.2d 916 (1981). When a claim is "fairly debatable," the insurer is entitled to debate it, whether the debate concerns a matter of law or fact. Ibid.

Under those authorities the plaintiff in a "bad faith refusal" case has the burden of proving:

(a) an insurance contract between the parties and a breach thereof by the defendant;

(b) an intentional refusal to pay the insured's claim;

(c) *the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);*

(d) *the insurer's actual knowledge of the absence of any legitimate or arguable reason;*

(e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.

In short, *plaintiff must go beyond a mere showing of nonpayment and prove a bad faith nonpayment, a nonpayment without any reasonable ground for dispute.* Or, stated differently, the plaintiff must show that the insurance company had no legal or factual defense to the· insurance claim.

The "debatable·reason" under (c) above means an arguable reason, one that is open to dispute or question. Webster's Third New International Dictionary (1931) at 116. See *Chavers* at 10; see also Embry, J. concurring on rehearing in *Aspinwall v. Gowens,* Ala., 405 So.2d 134 (1981). (emphasis supplied).

Then the Supreme Court of Alabama decided *National Savings Life Insurance Co. v. Dutton,* 419 So.2d 1357 (Ala.1982), which took the limitation another step by saying:

In ·Bowen, supra, we set out the elements of the tort and attempted to show the plaintiff's burden in these cases. It is a heavy burden. *In the normal case, in order for a plaintiff to make out a prima facie case of bad faith refusal to pay an insurance claim, the proof offered must show that the plaintiff is entitled to a directed verdict on the contract claim and, thus, entitled to recover on the contract claim as a matter of law.* Ordinarily, if the evidence, produced by either side creates a fact issue with regard to the validity of the claim and, thus, the legitimacy of the denial thereof, the tort claim must fail and should not be submitted to the jury. (emphasis supplied).

A "debate" here rages over the arbitration prerequisite, together with differing opinions as to the amount of the damage. This makes it impossible to conclude that there was no legitimate or debatable reason for St. Paul's not paying Southeast's claim as originally demanded. Nowhere does it appear that Southeast offered to accept, without prejudice, St. Paul's estimate of the damage, and that St. Paul refused to pay its own estimate. To the contrary, there was, and is, a true dispute, both as to whether or not St. Paul has any obligation to pay without Southeast's first submitting to arbitration, and as to the actual amount of the loss. St. Paul has even paid a partial summary judgment in the amount of $109,145.81 without objection, further manifesting its "good faith". Southeast's charge of "bad faith" is without legal basis. Even Southeast's own appraisals are in differing amounts. Southeast could hardly have obtained a "directed verdict" in the amount of John O. Freeman's estimate because it consisted of a *range.* St. Paul has never denied its obligation to pay the loss.

The lessons from *Bowen* and *Dutton* not only call for reconsideration of Judge McFadden's order allowing Southeast to proceed with a claim of bad faith, but for a change in this ruling on the issue. Judge McFadden's order in this regard is due to be set aside, and St. Paul's motions to strike and to dismiss, construed by the Court as a motion for summary judgment, are due to be granted as to the claims of "bad faith".

On June 25, 1981, Judge McFadden ordered Southeast "to consolidate into a single pleading the original complaint and the amended pleading which have been allowed". Perhaps because of its request for reconsideration, Southeast has never complied with this order. Its failure to do so forms no basis for the present rulings of this Court.

Because the effect of this opinion and the accompanying order, taken with the previous orders entered by Judge McFadden, is to finally adjudicate all of Southeast's claims in favor of the defendant, St. Paul, it is unnecessary for the Court to consider Southeast's request that the court seek instructions from the Supreme Court of Alabama and its alternative request that the Court say the magic words which would permit an interlocutory appeal to the Eleventh Circuit.

An appropriate order is being· contemporaneously entered.

## ORDER

In accordance with Memorandum Opinion entered this day in the above entitled civil action, it is hereby

ORDERED that plaintiff's motion for leave to amend complaint be and the same hereby is DENIED. This denial, which amounts to a ratification of the prior ruling of Hon. Frank H. McFadden as to the contract claim, is without prejudice to the said claim after the arbitration process has run its course.

On reconsideration, on the Court's own motion, the Court expressly determines that there is no genuine issue as to any material fact as to all other aspects of the complaint, and that defendant's motions, construed as motion for summary judgment, are due to be granted.

It is therefore

ORDERED, ADJUDGED and DECREED that defendant's motion for summary judgment be and the same hereby is GRANTED and that all existing counts of plaintiff's complaint be and they hereby are DISMISSED with prejudice.

Costs are taxed against plaintiff.